UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 17-10368-DJC |
| | ) | |
| MASON STICKNEY | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant Mason Stickney, by his counsel, respectfully submits this Sentencing Memorandum.

I. **Defendant's Personal History**

Mason Stickney is 21, born to unmarried parents. Both were together for much of his young life, from 1996 to 2011, in a relationship rife with domestic abuse. His father as a child had special educational services while in school and as an adult abused alcohol. He physically and emotionally abused young Mason, repeatedly calling him a "freak," as well as was physically abusive toward his mother. She reported an incident in 2011 where his father pulled a gun on her in front of the children. Young Mason and his sister where removed from the home and placed in the custody of the Department of Child and Families (DCF) for about eight months due to concerns about their safety in the home. His father was charged with Assault and Battery with a Dangerous Weapon and sentenced to serve two years in a correctional facility.

As a toddler, Mr. Stickney was diagnosed with lead poisoning and manifested delays in speech and motor development. There is no record of intervention services until he entered kindergarten, when he was identified as developmentally delayed. He was described as often "hiding under the teacher's desk" and exhibited clingy behavior toward his mother indicative of separation anxiety. He was evaluated in a clinic of Children's Hospital in Salem and diagnosed with Pervasive Developmental Disorder. At about the same time, he was diagnosed with Asperger's Disorder (currently referred to as Autism Spectrum Disorder).

1

He had an Individual Education Program (IEP) since kindergarten. He was educated in a substantially separate classroom and was mainstreamed for physical education. Throughout his school years, he was the victim of teasing and bullying, suffering from peer rejection without any friend group. His mother reported that "The kids were cruel to him, telling that he should kill himself, calling him a retard."

After his father's 2011 arrest for domestic assault, young Mason was placed in the physical custody of DCF, along with his younger sister, and both remained in DCF custody from January 2011 to August 2011. He recalls this period as the beginning of feelings of depression and anxiety. He recalls being placed in various foster home and residential therapeutic school placements, including Crossroads in Marlborough, St. Anne's in Methuen, Solstice Day School in Rowley, and Lighthouse School in Chelmsford.

In March 2011, while at Crossroads and two months after he was removed from the custody of his mother, he was admitted to Hampstead Hospital in New Hampshire for exhibiting aggressive behavior toward his peers. His behavior included verbal threats and the smearing of his feces on a peer. He was initially admitted to the children's unit and was transferred to the adolescent unit after he was observed teasing younger patients and coaxing them into misbehavior. He was discharged back to Crossroads after about two weeks in the hospital with the diagnosis Posttraumatic Stress Disorder, Pervasive Developmental Disorder, Not Otherwise Specified (NOS), and Borderline Intellectual Functioning. He was prescribed Abilify, an antipsychotic often prescribed for mood stabilization. He was not diagnosed with exhibiting psychotic symptoms. Back at Crossroads, he began cutting his wrists and engaging in other acts of self-harm.

At St. Anne's, he exhibited behavior that suggested he was experiencing auditory hallucinations, such as walking around and mumbling to himself, "'why are they laughing at me? Are they making fun of you?'" He was described as displaying disorganized speech, disorientation,

and confusion. He also made up a story about witnessing his father murder his father's girlfriend and helping him dispose of the body. He reported urges to commit self-harm and reported to a therapist that he was the victim of sexual abuse in a foster home. The allegation was investigated by DCF and assessed as unsupported. He was returned to the custody of his mother after eight months where he remained with her until his arrest.

Intellectual testing administered in 2011 reported Average Verbal Comprehension, Low Average Perceptual Reasoning, Average Working Memory, and Extremely Low Processing Speed. He was re-administered intellectual testing in 2016 and scored in the Above Average range on Verbal Comprehension, a measure of verbal reasoning ability; Borderline Intellectually Disabled to Low Average on Perceptual Reasoning, a measure of nonverbal abilities; Borderline Intellectually Disabled on Working Memory, a measure of short-term auditory memory; and Borderline to mildly Intellectually Disabled on Processing Speed, a measure of his speed and efficiency of visual processing. Due to the significant difference between his verbal and perceptual reasoning abilities, he was diagnosed with a Nonverbal Learning Disability and was noted to exhibit problems with mood and anxiety, as well as social skill deficits.

He was readmitted to Hampstead Hospital in January 2013 and was discharged about a week later. His admission was precipitated by his self-report of hallucinations and emotional distress and reaction to harassment from peers at school. He had tried to stab himself with a pencil while at school. He exhibited poor ability to read social cues and maintained poor interpersonal boundaries. His diagnoses at discharge included Pervasive Developmental Disorder and Mood Disorder. He was prescribed Abilify, Trileptal (mood stabilizer), and Clonidine (anxiolytic or anti-anxiety).

His third admission occurred in October 2015 to Pembroke Hospital from Anna Jacques Hospital. Emergency services were summoned when he became emotionally unstable displaying

3

aggressive behavior and making suicidal threats. He reportedly was emotionally triggered while observing the police intervene to aid his brother's girlfriend who was also in an emotional crisis. He reportedly threatened his mother with a knife and threatened to hurt himself. He became overwhelmed emotionally and ran from the house and into a nearby woods. He was taken to a nearby emergency room and was then admitted to Pembroke Hospital for psychiatric treatment. He exhibited no disorganized or aggressive behavior at the hospital and was cooperative with treatment. He was diagnosed with Pervasive Developmental Disorder, Mood Disorder, Conduct Disorder and AD/HD. He was prescribed Prozac, an anti-depressant.

In July 2016, he tried to harm himself, drinking bleach after believing that his sister had left home without saying goodbye. In September 2016, he was hospitalized at Lowell Treatment Center after he reported dissecting a dead animal in his yard.

During the pendency of charges in state court, he was admitted to the Worcester Recovery Center and Hospital (WRCH) in October 2016 for an evaluation of his competence to stand trial by the Newburyport District Court. His attorney at the time referred him for an evaluation of his competence based on his odd behavior at court and his history of psychiatric hospitalization. An evaluation was conducted by the Newburyport Court Clinic on October 6, 2016. According to the report, he was unable to provide an accurate understanding of the limits of confidentiality. The evaluation went forward, limiting the inquiry to his history and current mental status functioning. He manifested paranoid thinking and ideas of reference (psychotic thinking involving the false belief that innocuous events refer to him or are about him when they in fact are not, such as believing that the television or radio is talking about him) with homicidal and suicidal ideation without present intent. He was depressed and self-reported olfactory and gustatory hallucinations but not visual or auditory hallucinations. The district judge ordered him to be committed to the hospital for an evaluation of competence to stand trial and criminal responsibility.

4

At WRCH, he was described as cooperative with treatment and did not exhibit or report mood or psychotic symptoms. He was described as malodorous and having poor grooming habits. He reported a history of self-cutting beginning at age 12, mostly associated with stress relief but some contained suicidal intent. He also reported a history of self-asphyxiation and an instance of drinking bleach that did not require medical treatment. He did not report current suicidal ideation. He was administered a test of malingered cognitive problems which indicated that he was intentionally attempting to feign cognitive deficits. He was assessed as not manifesting symptoms of a psychotic disorder and not meeting clinical criteria for continued hospitalization. A drug screen was negative for drugs. He was prescribed Prozac, an antidepressant.

His mother reported to the forensic examiner at WRCH that Mr. Mason experienced a decrease in his mental status functioning in January 2016 following his discovery of his brother as non-responsive from a heroin overdose requiring an emergency response. She reports that following this stressful event, he was more emotionally labile and dysregulated. She also reports finding a dead mole in her trunk, which apparently Mr. Stickney had found outside and dissected in the house. He told the forensic examiner that he had "raped" the dead mole. He also described having sadistic sexual fantasies of rape and murder and homicidal fantasies about police. His statements in group were described as "bizarre, and full of violent imagery." However, given his suspected feigning of cognitive symptoms, the veracity of his self-reported violent fantasies was difficult to assess and may have been a function of defensive attempts to appear "tough" as opposed to vulnerable.

The forensic examination report from WRCH concluded that while his clinical presentation and self-report were of doubtful veracity, he did not manifest acute symptoms of mental illness, was not experiencing symptoms or deficits that would impair his abilities to understand and rationally participate in his defense, and he did not meet criteria for continued hospitalization.

Mr. Stickney was admitted to Bridgewater State Hospital on April 6, 2017 from the Essex County House of Corrections pursuant to M.G.L. Chapter 123, section 18(a) for an evaluation of his need for continued hospitalization in a secure psychiatric setting. Clinical staff at BSH spoke with the Mental Health Director at Essex County Correctional Center and were informed that he was a significant management problem at the jail, calling an outside crime hotline claiming that he was being attacked by ISIS and calling an inmate's wife telling her that her husband was "bleeding out." His behavioral management problems had been escalating, and he had recently been charged with physically assaulting and biting a correction officer at the jail.

In a Clinical Progress Note, dated April 21, 2017, he declared his hope that he would committed to the hospital. Additionally, he continued his pattern of making provocative and shocking statements. For example, he stated, "I'm still doing messed up shit. The other day voices told me this kid was going to get me. Then on Easter, the same thing happened so I sucker punched him and I guess he's a well-liked kid, so they beat the shit out of me." He went on to say, "I should be learning new ways to cope with my issues. I want to get committed because if I go back to jail, I'll just pick up new charges. I'm still doing that shit here. Yesterday I stripped down naked and chased a patient." He in fact did receive a disciplinary report for running naked through the hospital yard. His Discharge Summary, dated May 4, 2017, diagnosed him with an Unspecified Personality Disorder.

Overall, although Mr. Stickney reports that he has some friends, a more candid answer is that he likely has none, only his mother and sister who care a great deal for him and worry about him. Since leaving high school, he rarely left his house, spending most of his time online in the imaginary world of computer games. He is burdened by cognitive limitations, perhaps traceable to early childhood lead poisoning. His early years were ones of abuse, bullied by fellow students for his obvious cognitive limitations and social impairments. A measure of his pitiable life: his single

memory of happiness was attendance at a cookout. Another measure: years of self-harming behaviors, self-cutting, striking his head on walls, and thoughts of suicide, with a multitude of admissions to psychiatric hospitals, beginning at a young age. Transferred from school to school, he was not awarded a high school diploma because he did not pass the MCAS. He has held one prior job at J.C. Penney at a local mall as a stock clerk for about eight months. Physically, he is weak; the presentence report notes that he has difficulty lifting objects due to limited strength, PSR at ¶ 78.

Importantly, he has expressed a critical insight: in an above-quoted clinical note from 2017, he admitted that "I'm still doing messed up shit …. <u>I should be learning new ways to cope with my issues</u>…." (emphasis added). Indeed, learning to deal with other people and with one's grievances with them, not in outbursts and expressions of violence, but with "new ways to cope with my issues," is a hard-earned insight for him, one for which he looks for help so he does not get into more trouble. Helping him to learn how to cope, so he can deal positively with his many challenges, is an important challenge in this sentencing.

Prior to his arrest, he received social security benefits for his many developmental disabilities. His mother was his representative-payee.

II. **The Offense Conduct and its Context**

On March 6, 2019, Mr. Stickney pled guilty to a three-count indictment charging use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958(a), of a Massachusetts police officer, a college student and a man who owned a restaurant. In his change of plea, Mr. Stickney admitted committing the offenses, that he had "used … a facility of interstate commerce with intent that" three murders occur, "as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value."

7

In considering the appropriate sentence, context matters. The conduct here, while charged in 3 counts, arose from a single course of conduct. A fellow detainee, one with a staggeringly long record, had struck up a conversation with defendant. The man, owner of a lengthy criminal history - now over 90 charges since mid-1988, and a status as a level 2 sex offender- was seeking to do what he had done before, namely to trade cooperation to reduce his committed sentence. He had in the past avoided state prison by this means and was motivated to do so again, as he was facing indictment for domestic strangulation of his girlfriend.

Mason Stickney, friendless, troubled and alone, was an easy mark. Stickney spoke in the language of deep resentments against those who mocked him or whom he viewed as threatening. The man offered him a possibility, to have the people who harmed him or could harm him killed. The conversations between Stickney and the man developed over time. As the presentence report notes at ¶ 9, there were "roughly thirty face-to-face conversations" before the man reached out to the authorities, an unnecessary delay if Stickney made his intentions clear and if, as the man claimed, "Stickney told him that he was aware that Complainant was a "serious" individual in whom Stickney could confide." PSR at ¶ 9.

In the real world, no hit man works for free. Stickney had no money; prior to being detained, he was the beneficiary of Social Security Disability with his mother as payee. With no means, Stickney could do nothing, let alone interest a hit man in work. But he could be duped into a fantasy of revenge by an illusion of power, with a hit man offering to do the deeds, even coming to the institution to offer his services. Few would fail to sense that only law enforcement makes such offers.

Unless, that is, the mark is a marginalized, mentally ill young man with deficits in processing speed, perceptual reasoning and working memory bordering on the intellectually disabled. Stickney was acutely vulnerable to the apparent "friendship" and attention of a fellow

8

detainee who went out of his way to seek his company and who over time helped mold a fantasy into an apparent plan. By the time the informant offered up Stickney to law enforcement, Stickney was primed to giving voice to the ugliest and most misanthropic fantasies.

This is not to say that no crime occurred here. By definition, the offense requires only an offer of value, not proof of the means to do so, together with an intent that a murder occur. The statute's minimal proof requirements leave a wide berth for the government to nurture and develop sting operations. By the time the informant approached law enforcement, Stickney was committed to the scheme and expressed his wishes in harsh and cruel terms. The issue here is not whether he committed the crimes; it is whether mitigation exists where he was primed to embrace and did embrace a false opportunity, one which would never have occurred in the real world.

A pertinent case is United States v. Jose Carmona, Cr. 12-cr-30047-MGM, which involved a single charge of murder-for-hire. Therein, the court noted that the defendant went so far as to say that "he really wanted to kill the victim himself," and remarked how "extraordinarily disturbing the whole conversation of [the] murder scheme [was]," but nonetheless found:

> there is clear evidence the defendant sustained a significant head injury in the past and, as indicated in the multiple mental health evaluations reviewed by the Court, the defendant suffers from cognitive and emotional deficits caused by, or at least secondary, to that head injury. As a result of his mental and emotional condition, the Court is departing downward to a Total Offense Level of 26. Therefore, the Court approaches sentencing with the framework created by a Total Offense Level of 26 and a Criminal History Category IV, an advisory guideline range of 92 to 115 months.

Id., at Dkt. 103. Notwithstanding the defendant's significant criminal history, a circumstance quite unlike here, the court sentenced the defendant to a term of 70 months committed.

In its reasoning, the Carmona court took careful note of circumstances similar to the present case:

> -- there were essentially two issues that's led me to look into his mental status at the time he was involved in these negotiations. Number one is him wanting to engage in a scheme

where he hires someone to commit a killing, an extraordinarily serious offense, with no money to hire anyone. I'm going to pay you from a Social Security settlement.[1]

The other issue is the discussions about a weapon and the confidential source, the confidential cooperator that he's talking to is saying, well, there's no gun? Well, where is a gun going to come from? Mr. Carmona at no time says he can provide a weapon.

Transcript of Sentencing Hearing in United States v. Carmona, 3:12-cr-30047-MGM (April 1, 2015), dkt 108. In Carmona, as here, there was no money, nor did the defendant contribute any means to actually commit the offense. Notwithstanding the "bizarre" and "troubling" comments made by Carmona about the plan, see Trans. at 39, 41 and 43, and notwithstanding Carmona's significant criminal history, the court imposed a substantially reduced sentence. A fair reading of the sentencing outcome is that the court viewed the conduct as akin to an attempt, with no likelihood of actual commission, a form of mitigation which finds support in USSG §2X1.1, which addresses attempt crimes, which reduces an offense by 3 levels "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control."

Defendant suggests that the Court here might view the analysis in Carmona as shedding important light on a possible outcome here.

III. **The Appropriate Guideline**

In its calculation of the guideline, Probation invokes subpart (a)(2) of USSG §2E1.4 to cross over from §2E1.4 to § 2A1.5. The two guidelines follow:

---

[1] The court added that Carmona told the informant that
> he wanted to set up a murder-for-hire scheme and told the individual [informant] that he essentially had no money. He was collecting Social Security and was waiting for a Social Security settlement, which who knows if that would ever come, but he may get a Social Security settlement in the future which would be the source of his money for this murder-for-hire scheme.

Transcript of Sentencing Hearing, 12-CR-30047, dkt 108 at 40.

### §2E1.4. Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire
(a) Base Offense Level (Apply the greater):
(1) **32**; or
(2) the offense level applicable to the underlying unlawful conduct.
Commentary
**Statutory Provision:** 18 U.S.C. § 1958 (formerly 18 U.S.C. § 1952A).
**Application Note:**
1. If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used.
**Background:** This guideline and the statute to which it applies do not require that a murder actually have been committed. *Historical Note* Effective November 1, 1987. Amended effective November 1, 1989 (amendment 144); November 1, 1990 (amendment 311); November 1, 1992 (amendment 449).

### §2A1.5. Conspiracy or Solicitation to Commit Murder
(a) Base Offense Level: **33**
(b) Specific Offense Characteristic
(1) If the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, increase by **4** levels.
(c) Cross References
(1) If the offense resulted in the death of a victim, apply §2A1.1 (First Degree Murder).
(2) If the offense resulted in an attempted murder or assault with intent to commit murder, apply §2A2.1 (Assault with Intent to Commit Mur-der; Attempted Murder).
Commentary
**Statutory Provisions:** 18 U.S.C. §§ 351(d), 371, 373, 1117, 1751(d).

As is apparent, §2A1.5 adds points for the offer of pecuniary value, which is a matter presumed within the § 2E1.4 guideline.

A fair reading of § 2E1.4 is that a plain or "vanilla," if you will, type of murder-for-hire nets 32 points (consistent with the 10 year maximum), while a cross- over exists for aggravating conduct where the statute increases the maximum penalties (for example, the statute, 18 USC § 1958a, carries enhanced penalties "if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment"). So if there is no "plus factor," the guideline remains 32.

As read by Probation, however, if the "underlying unlawful conduct" is murder for hire, one moves to the solicitation for murder guideline. Therefore, the (a)(1) provision is effectively a nullity; any murder for hire moves via (a)(2) to a different and higher guideline, one calling for a guideline which far exceeds the maximum penalty.

This reading is not without some support. In <u>United States v. Vasco</u>, 564 F.3d 12, 23 (1st Cir. 2009), the court found no error where a defendant challenged use by the sentencing court of the cross-reference.

> The reference in § 2E1.4 to a BOL of the greater of thirty-two or "the offense level applicable to the underlying conduct" is curious, as virtually every time a defendant is charged with the use of interstate commerce facilities in the commission of murder-for-hire, the underlying unlawful conduct will be solicitation to commit murder. Thus, the BOL for the use of interstate commerce facilities in the commission of murder-for-hire is thirty-three under the cross-reference to § 2A1.5. We see no impropriety in the district court's having used the cross-reference.

The court did not find the outcome to be error ("no impropriety"), but neither did it find the reading terribly satisfactory or binding. Certainly, its use of the word "curious" is an acknowledgment that a reading of the guideline which renders the provision in (a)(1) meaningless and the guideline effectively neutered, is hardly optimal. Indeed, such a reading would violate the surplusage canon of construction, that every word and provision is to be given effect (verba cum effectu sunt accipienda), and none to have no consequence. See <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001), citing <u>Market Co. v. Hoffman</u>, 101 U.S. 112, 115 (1879) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'"); Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 174 (2012). Here, Mr. Stickney plead guilty to a statutory offense explicitly linked to section 2E1.4 and wholly captured within its terms, with no aggravating conduct causing a cross-over to another guideline.

In contrast, § 2A1.5 is specifically linked to other statutory provisions, e.g., 18 U.S.C. § 351(d) [assassination of a Congressperson or Supreme Court Justice], § 371, § 373 [solicitation to commit a crime of violence, § 1117 [conspiracy to murder], and §1751(d) [Presidential assassination]. Each reflects by its greater statutory maximum a crime of a different gravity. The remaining offense, solicitation to commit a crime of violence, is an anomaly even here, as it

denotes no specific crime and marks the maximum penalty as half of the substantive offense, which would most frequently be well below the guideline here. Nowhere does § 2A1.5 cite 18 U.S.C. § 1958 as the relevant "statutory provision," nor does § 2E1.4 give fair warning that it collapses utterly into the separate guideline.

Indeed, § 2A1.5 was added by a 2003 Amendment to the Guidelines (Appendix C, Amendment 311), within the same amendment which increased the guideline level under § 2E1.4 to 32 ("Section 2E1.4(a)(1) is amended by deleting '23' and inserting in lieu thereof '32'"). The Commission's action in increasing the offense level under § 2E1.4 to the statutory maximum makes plain that section 2E1.4 was intended to continue to function as the offense-specific guideline for a 18 U.S.C. § 1958 offense, not that it was eclipsed by the simultaneous creation of an entirely separate guideline.

Indeed, in the above-cited decision in United States v. Carmona, 3:12-cr-30047-MGM (April 1, 2015), the court found, and the parties including probation agreed, that the applicable base offense level was 32 under § 2E1.4.

IV. **The Guidelines: National Trends**

Nationally, the rate of within-guideline sentences has consistently remained slightly below 50%, moving from 52% in FY2012, to 51% in FY2013, to 46% in FY2014, to 47.3% in FY2015, to 48.6% in FY2016 and to 49.1 in FY2017. See USSC, Comparison Of Sentence Imposed And Position Relative To The Guideline Range, Table 8, FY 2017. In this District, the rate has been well below 50%, from 43% in FY2012, to 39% in FY2013, to 23% in FY2014, to 25% in FY2015, to 27.5% in FY2016, and to 31% in FY2017. See Statistical Information Packet, Fiscal Year 2017, District of Massachusetts.

## V.     The Appropriate Sentence

Apart from the present case, Mr. Stickney awaits adjudication of his pending state charges. See PSR at ¶¶ 54-57. He has been in state custody on these matters since October 25, 2016, all of it on the state clock, and none available as credit here (since the jail time was not "a result of any other charge for which the defendant was arrested **after** the commission of the offense for which the sentence was imposed" [emphasis added]).[2] Consequently, even if the sentence here is ordered to run concurrently from the date of sentencing, as defendant will urge, such a sentence would commence on the date of sentencing and would not recapture past time served. Thus, his already-served-custody, which is unavailable to lessen any federal sentence, is two years and nine months to date.

Defendant asks this Court to sentence him to 60 months custody, ten months less than the sentence imposed in United States v. Jose Carmona, Cr. 12-cr-30047-MGM, and for similar reasons (save for the increase due to Mr. Carmona's criminal history):  Mr. Stickney is a cognitively limited and vulnerable young man who offered neither the money or the means to commit the crime, and whose pitiable past fairly cries for positive intervention less than imprisonment in the dangerous confines of a federal prison.

Defendant asks that this term be ordered to run concurrently with any yet-to-be-imposed state sentence.  See Setser v. United States, 566 U.S. 231 (2012) (in sentencing a defendant for a federal offense, a district court has authority to order that the federal sentence be consecutive to or concurrent with an anticipated state sentence that has not yet been imposed). A concurrent sentence

---

[2] The relevant statute, 18 U.S.C. § 3585(b), reads as follows:
   Credit for prior custody. A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences--
      (1)  as a result of the offense for which the sentence was imposed; or
      (2)  as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;
   that has not been credited against another sentence.
18 U.S.C. § 3585.

of 60 months, which would run from the date of sentencing forward, would assure continued custody for a period approximating five years. Combined with the time already served in state custody (33 months), the effective period of cumulative custody would be an unbroken period of 93 months, a severe period of incarceration for a young man with, to date, no criminal convictions.

In contrast, a federal <u>consecutive</u> sentence would not commence until he is released from state custody (since he will remain in the primary custody of the state until each of his state sentences would be served). Moreover, it would fail the demands of 18 U.S.C. § 3553 that a sentence be no greater than necessary to achieve the ends of justice.

Defendant submits that a term of 60 months, to commence this day and to run concurrently with any yet-to-be-imposed sentence in pending matters in Essex county, is "sufficient, but not greater than necessary" to achieve the ends of justice. See 18 U.S.C. § 3553(a).

Respectfully submitted,

MASON STICKNEY
By his attorney,

*/s/ Charles P. McGinty*
Charles P. McGinty
B.B.O. #333480
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 18, 2019.

*/s/ Charles P. McGinty*
Charles P. McGinty