UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 17-10368-DJC |
| MASON STICKNEY, | ) | |
| | ) | |
| Defendant | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this Memorandum in support of its position that the Court should sentence defendant Mason Stickney (the "defendant") to 151 months in prison.

**The Offenses of Conviction**

The defendant was charged by indictment with three counts of murder-for-hire, in violation of 18 U.S.C. § 1958(a). The evidence shows that the defendant, who was then being held pre-trial at the Essex County Correctional Facility ("Essex"), agreed to pay $10,000 to a man he believed to be a hitman but who actually was an undercover FBI agent (the "UCE")to murder three people: a detective with a local police department (the "Police Officer"), a college student (the "Student"), and the owner of a restaurant in New Hampshire (the "Restaurateur"). Specifically, the defendant instructed the UCE to kill the Restaurateur using a firearm with a silencer, to cut off his hands, and to dispose of the body at sea. He told the UCE to

kill the Police Officer with a firearm and to use the

Restaurateur's hands to place the fingerprints of the

Restaurateur on the firearm. He told the UCE to kill the

Student, decapitate him, and dispose of the body at sea.

The defendant also told the UCE to kidnap the niece and

nephew of the Assistant District Attorney who was then

prosecuting him (the "ADA"); to videotape them pleading with the

ADA to help them; to force the ADA to ensure that the defendant

received no more than one year on his pending case; and to kill

the niece and nephew anyhow. In fact, however, the defendant

was incorrect in his belief that the ADA had a niece and a

nephew.[1]

**The Role of the CW**

The defendant's disturbing plans came to light when

another pretrial detainee at Essex (the "CW") approached

authorities and said that the defendant had approached him,

initially to ask whether he could assist the defendant in

obtaining a silencer but ultimately to assist in having the

victims murdered. The CW agreed to cooperate with law

enforcement and recorded conversations with the defendant in

---

[1] The defendant's case in Essex is now being prosecuted by an ADA
from the Plymouth County DA's Office.

which, among other things, the defendant described his desire to have the victims murdered. The CW also provided the defendant with contact information for the UCE, telling him that the UCE was able to pose as an attorney and that the defendant could meet with the UCE and speak with him on the phone without fear of being recorded.

In his sentencing memorandum (the "Memo"), the defendant claims that it was the CW, seeking sentencing consideration with respect to his own open case, who broached the notion of murder-for-hire: that it was the CW who "offered [the defendant] a possibility, to have the people who harms him or could harm him killed," and that the CW "duped [the defendant] into a fantasy of revenge[.]" Memo at 8. This is simply not true. Had the case gone to trial, the CW would have made clear that it was the defendant who came to him with plans to commit these murders, and not the other way around.

Moreover, circumstances confirm the CW's version of events. For example, the PSR recites at Paragraph 55 information relating to the defendant's open case for threatening to commit murder, stalking, making annoying telephone calls, and related offenses. The case began when the defendant reported to the Seabrook Police that he was physically and sexually assaulted by

two men and two women in August 2016, before he was incarcerated

at Essex and before he met the CW.  One of the men turned out to

be the Student, and one of the women turned out to be the

Student's pregnant girlfriend (the "Girlfriend").  The police

determined that the defendant was not credible. Meanwhile, the

Salisbury Police received information about two threatening

voice recordings involving "a plot to assault, maim, torture,

and murder two Salisbury residents," the Student and the

Girlfriend.  PSR ¶ 55. In a recorded conversation, the defendant

said:

> I'm gonna fuck his girlfriend, not him.  I
> wanna see his girlfriend up close so I can
> smash her in the skull.  I wanna see her
> come up close to me so I can smash her skull
> in, in front of you and [Student].  If it
> gets messy with [Sudent] and [Girlfriend] or
> something happens to her kid, would you
> snitch on me?  So if her baby ended up dying
> tonight you wouldn't say anything?  Well,
> I'm gonna fucking make sure her baby dies,
> that's for damn sure.  I'm gonna make him
> bleed until he kills me.  I'm gonna fight
> [Student].  I want [Student] there and I
> want [Girlfriend] there.  I have nightmares
> of them.

*Id.*

When police spoke to the Girlfriend, she said the defendant

had been stalking her and harassing her via Facebook since at

least September 2015.  In particular, the defendant sent her 36

messages and called her 17 times in a two-minute span on August
20, 2016.  The messages involved the defendant's threats to harm
the Girlfriend and her unborn child, including "I wanna cut ur
kid out" and "Come here I can rape ur baby."  PSR ¶ 55.  The
Girlfriend said the defendant had approached her at Hampton
Beach in a threatening manner and told her employer that she was
selling drugs outside the business.

In short, the CW had nothing to do with stoking the
defendant's resentment against the Student or inciting the
defendant to seek to commit acts of violence against the Student
and/or those close to him.

Similarly, a warrant-authorized search of the defendant's
computer[2] revealed that the defendant had been doing homework
regarding the three victims before he was arrested and before he
ever met the CW.  There were searches involving the Student's
name, the Girlfriend's name, and the Restaurateur's name.  There
were searches regarding the police department for which the
Police Officer worked.  More generally, there were searches
involving the terms "hitman blood money," "hitman contracts,"
and "kidnapping and murder," as well as searches related to

---

2 The defendant told the UCE that, before he embarked on the
murders, he should contact the defendant's mother, get hold of
the defendant's computer, and remove and destroy the hard drive.

firearms.

In short, the defendant was not "duped" into doing
anything: he was doing research regarding the victims and hitmen
well before he and the CW ever met.

**The Guidelines**

The government believes the PSR has correctly calculated
the Guidelines Sentencing Range ("GSR") in this case.

According to the PSR, the base offense level for each of
the three counts is the greater of the base offense level of 32
set forth at USSG § 2E1.4(a) or the offense level applicable to
the underlying unlawful conduct.  PSR ¶¶ 19-39.  In each case
the greater offense level is that pertaining to the underlying
unlawful conduct, Conspiracy or Solicitation to Commit Murder.
*Id.*  That offense level is 37, comprising a base offense level
of 33 pursuant to USSG § 2A1.5(a), and four additional levels,
pursuant to USSG § 2A1.5(b)(1), because each count involves the
offer or receipt of a thing of pecuniary value for undertaking
the murder.  *Id.*  There is a further, multiple count adjustment
pursuant to USSG § 3D1.4(a), (b), for a combined adjusted
offense level of 40.  PSR ¶¶ 40-43. The total offense level,
after adjustment for acceptance of responsibility, is 37.  PSR
¶ 47.  With a CHC of I, this results in a GSR of 210 to 262

months.

The defendant disagrees, arguing, in essence, that the
cross-reference to § 2A1.5 applies only in the case of
"aggravating conduct" while an ordinary or "vanilla" instance of
murder-for-hire should be sentenced in accordance with § 2E1.4.
Memo at 10-13.  The defendant concedes that the First Circuit,
after noting that the cross-reference is "curious" given that
"virtually every time a defendant is charged with ... murder for
hire, the underlying unlawful conduct will be solicitation to
commit murder," nonetheless upheld the district court's use of
the cross-reference.  Memo at 12, citing *United States v. Vasco,*
564 F.3d 12, 23 (1st Cir. 2009).  But because the court used the
word "curious" and phrased its affirmance in terms of finding
"no impropriety" in the use of the cross-reference, the
defendant suggests that the First Circuit did not "find the
reading terribly satisfying or binding."  Memo at 12.

The government disagrees with the defendant's reading of
the guidelines and *Vasco.*  USSG § 2E1.4(a) clearly provides that
it is the greater of 32 or the offense level applicable to the
underlying unlawful conduct that applies.  Even though it is
curious, and even though in virtually every murder-for-hire case
it is the offense level at USSG § 2A1.5, which is greater than

32, that will apply, that is what a plain reading of the
guidelines provides.  The government is not aware of any other
situation in which the same conduct can be sentenced under
different guidelines provisions, and neither the plain text of
the guidelines nor the First Circuit's choice of words in *Vasco*
suggests that murder-for-hire is any different.  *See also, e.g.,*
*United States v. Lisyansky,* 806 F.3d 706, 709-10 (2d Cir.
2015)(district court neither misinterpreted nor misapplied
guidelines in computing murder-for-hire sentence based on
§ 2A1.5, citing cases).

**Government's Recommendation**

The government recommends that the Court sentence the
defendant to 151 months in prison, together with three years of
supervised release and the mandatory $300 special assessment.
This variance is the equivalent of the low end of the GSR that
would pertain without the three-level increase in offense level
based on the multiple counts.  The government believes this
sentence to be sufficient but not greater than necessary to
vindicate the sentencing goals set forth at 18 U.S.C. § 3553(a).

**Nature of Offense and History Characteristics of Defendant**

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider
"the nature and circumstances of the offense and the history and

characteristics of the defendant."

As to the offense, the defendant downplays the gravity of his conduct, arguing that there was in fact no money. Memo at 8-9. Whether there was money or not, the defendant clearly told the UCE that he would pay him $10,000 in funds that he would be able to access once he was released. And whether there was money or not, the defendant clearly thought and intended after his last conversation with the UCE that his plans to kill the Police Officer, the Student, and the Restaurateur, as well as his plans for the ADA and her niece and nephew, were about to be carried out. The defendant's conduct was extraordinarily serious and is deserving of a significant sentence of incarceration.

As to the history and characteristics of the defendant, the defendant devotes much space to his upbringing and issues regarding his mental health. Memo at 1-7. It is worth noting in this regard the defendant's recent interactions with mental health professionals.

First, the defendant underwent a forensic competency evaluation for almost three weeks in October 2016, when he was awaiting trial in Essex on state charges. PRS ¶ 88. Upon his discharge the defendant was diagnosed with Depressive Disorder

with a history of autism spectrum illness, but "the evaluation

team concluded that there was not sufficient reason to pursue

commitment as there was no clear evidence of mental illness and

no documented history of psychotic illness." *Id.*

Second, the defendant was evaluated at Bridgewater State

Hospital after the state court ordered an evaluation to

determine whether he needed psychiatric hospitalization based on

incidents that had occurred at Essex.  PSR ¶ 88.  In part, the

defendant had called a crime hotline to report a terrorist

attack on Essex; had contacted and threatened to rape and kill

another inmate's wife; had bitten a corrections officer; and had

indicated he had experienced command auditory hallucinations

that compelled him to kill people.  *Id.*  According to the PSR:

> Upon admission, [the defendant's] initial
> assessment determined that he had
> Unspecified Personality Disorder, and the
> doctor concluded that the defendant "[s]eems
> too well-engaged, planned, and sadistic for
> Autism Spectrum."  During his evaluation
> stay, the defendant bit another patient, bit
> a mental health worker, ran naked across the
> pavilion, endorsed homicidal ideations,
> endorsed rape fantasies, and told staff that
> he "fucks dead animals."  He stated that
> when he finds dead animals, he cuts them up
> and rapes them.  Upon discharge, doctors
> determined that the defendant did not
> present with signs of any specified mental
> illness to make a diagnosis and that the
> defendant over-endorsed symptoms which
> invalidated two psychological tests.  They

>       determined that he did not meet the criteria
>       for Autism Spectrum Disorder and that he was
>       not presenting with genuine psychotic
>       symptoms or auditory hallucinations.  The
>       doctors believed that the defendant was
>       identifying his own violent thoughts as
>       "voices."

*Id.*

The PSR also reveals that the defendant, far from being all talk, does engage in violent conduct.  The defendant's violent threats and related conduct with respect to the Student and the Girlfriend are discussed above.  At least as concerning is the violence the defendant has exhibited while in custody.  At Essex, the defendant reported a terrorist attack on the facility, made the call threatening to rape and kill the other inmate's wife, and bit a corrections officer.  PSR ¶ 4.  After being transferred to the Billerica House of Correction on November 10, 2017, the defendant has been involved in at least 31 disciplinary incidents, including an assault on a corrections officer committed by butting his own head against the officer's head on July 30, 2018.  PSR ¶ 5.  And the defendant is facing a charge in Salem District Court for striking a court security officer in the head with both handcuffed hands.  PSR ¶ 56.  The defendant's willingness to commit violent acts while incarcerated does not bode well for his conduct when released.

**Seriousness of Offense/Respect for Law/Just Punishment**

In fashioning a sentence the Court also must consider the
need for the sentence imposed to reflect the seriousness of the
offense, to promote respect for the law, and to provide just
punishment for the offense.  18 U.S.C. § 3553(a)(2)(A).  As
noted previously the defendant's crimes are very serious.  While
the defendant suggests that his conduct arose from "a single
course of conduct," Memo at 8, this contention ignores the fact
that the defendant sought to have three separate human beings
murdered, not to mention the ADA's niece and nephew.  In order
to promote respect for the law and provide just punishment, the
Court must impose a significant sentence.  The defendant's
proposed sentence of 60 months, which is 150 months below the
low end of the GSR, fails to accomplish these ends.

**Adequate Deterrence**

This Court also must consider the need for the sentence to
afford adequate deterrence to criminal conduct.  18 U.S.C.
§ 3553(a)(2)(B).  Here, the Court must be concerned with two
forms of deterrence.  First, given the serious nature of the
crimes to which the defendant has pleaded guilty and the
discussion above regarding the defendant's violent proclivities,
even while incarcerated, a significant sentence is necessary to

12

specifically deter the defendant from engaging in further crimes when he is released.  Second, a significant sentence also is necessary to provide general deterrence to others similarly situated who might be tempted to engage in similar conduct.

**Need to Protect the Public**

A significant sentence also is appropriate pursuant to 18 U.S.C. § 3553(a)(2)(C) to protect the public from further crimes of the defendant.  This consideration, too, comes in two flavors.  First, among the members of the public that must be considered are, of course, the victims of the defendant's crimes.  The defendant has proven himself willing to have them murdered in the most callous and brutal of ways.  This conduct obviously is frightening and traumatizing, and the defendant should receive a significant sentence to afford the victims the knowledge that he will be incapacitated for a lengthy period of time.  In addition, and again, the record shows the defendant willing to engage in violent conduct himself, including biting, head-butting, and hitting with handcuffed hands members of law enforcement.  The defendant's casual resort to violence in a setting in which most incarcerated defendants refrain from it demonstrates the need for the public in general to be protected from the defendant's violent proclivities.

**Avoiding Unwarranted Disparities**

This Court also must consider the need to avoid unwarranted sentencing disparities in fashioning a sentence for this defendant. 18 U.S.C. § 3553(a)(2)(6). The defendant has recommended a sentence that is 150 months below the low end of the applicable GSR. While the government agrees that a variance is appropriate, a sentence of 151 months, which is the low end of the GSR that would apply absent the adjustment for multiple counts, is still tethered to the guidelines and thus significantly more likely to avoid unwarranted disparities among similarly-situated defendants than is the defendant's proposed sentence.

In this regard, the defendant cites to the sentencing of the defendant in *United States v. Carmona*, 3:12-cr-30047-MGM. It is always difficult to compare two defendants, particularly without knowing all of the facts. It appears, however, that the defendant in *Carmona* sought to have a single victim killed, while here the defendant sought to have the three victims killed, as well as the niece and nephew of the ADA. Moreover, while the defendant in *Carmona* had a criminal history, this defendant has a history of committing acts of violence. The fact that before he was arrested the defendant was actively

14

stalking and threatening the Student and the Girlfriend,

including apparently having at least one face-to-face encounter

with the Girlfriend, and the fact that he has engaged in

violence while incarcerated, appear, together with the number of

victims, to render this defendant's situation different from the

defendant in *Camora*.  Moreover, while the defendant points to

the mental health of the defendant in *Camora* as a basis for

treating this defendant similarly, the defendant's recent

evaluations strongly indicate that this defendant does not, at

least now, suffer from the mental disorders that some of his

past encounters with mental health professionals would suggest,

and that instead he has over-endorsed his symptoms.

## CONCLUSION

For the foregoing reasons, the government respectfully

recommends that the Court sentence the defendant to 151 months

in prison.


                              Respectfully submitted,

                              ANDREW E. LELLING
                              Acting United States Attorney

                    By:
                              /s/ Robert E. Richardson
                              ROBERT E. RICHARDSON
                              Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

Suffolk, ss.:                          Boston, Massachusetts

    I, Robert E. Richardson, hereby certify that I caused the foregoing to be served by electronic filing this date on counsel for the defendant.

                            /s/ Robert E. Richardson
                            ROBERT E. RICHARDSON